UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHIGAN FIRST CREDIT UNION,
a Michigan Credit Union,

        Plaintiff,

vs.

Case No. 05-CV-74423
HON. GEORGE CARAM STEEH

CUMIS INSURANCE SOCIETY, INC.,
a foreign corporation,

        Defendant.

_____/

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (#222) AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (#223)

This matter is before the court on plaintiff Michigan First Credit Union's (MFCU) and defendant CUMIS Insurance Society, Inc.'s (CUMIS) cross-motions for summary judgment as to MFCU's breach of contract claim under a $5.0 million Credit Union Bond, and MFCU's demand for 12-percent penalty interest under Michigan's Uniform Trade Practices Act (MUTPA), M.C.L. § 500.2006(1). For the reasons set forth below and at an April 24, 2008 hearing on the motions, MFCU's motion for summary judgment will be DENIED, and CUMIS's motion for summary judgment will be DENIED.

### I. Background

MFCU alleges CUMIS is liable pursuant to the terms of a written Credit Union Bond because three MFCU employees "consciously disregarded" MFCU policies established for a 2003 Indirect Lending Program with respect to 1,611 non-performing motor vehicle loans. The Bond provides coverage for losses "resulting directly from a named 'employee's' 'failure to faithfully perform his/her trust,'" which is expressly defined to "mean[] acting in conscious

disregard of [MFCU's] established and enforced share, deposit or lending policies." CUMIS denied coverage on the grounds that the losses resulted from insufficient "policies and procedures in place at the Board level to support the Program from its inception," and because there was insufficient evidence to conclude that MFCU employees "were jointly or individually making conscious decisions to circumvent an established policy."

The parties have proffered considerable evidence to support their competing motions for summary judgment. The record indicates that the three MFCU employees who allegedly "consciously disregarded" MFCU indirect loan lending policies are former MFCU Vice President of Lending Michael Lewis, former MFCU Indirect Loan Program Manager Joyce Clouthier, and Assistant Loan Center Manager Kathleen Batton. Michael Poulos was MFCU's Chief Executive Officer ("CEO") during the relevant period.

MFCU's Indirect Lending Program involved third-party vendor Aimbridge. Using Aimbridge's computer software, pre-approved car dealers submitted on-line credit applications. If financing was not automatically approved by Aimbridge as "A" or "B" credit risks, the credit application was forwarded to MFCU. Clouthier, the only full-time underwriter for the program, made 85% of the indirect loan decisions from July 2003 to January 2004, testifying that she approved only 1 out of every 3 indirect loan applications. Lewis was Clouthier's direct supervisor. Batton worked mostly with direct loans, and infrequently assisted Clouthier in processing indirect loan applications. Under the automated computer program, if a loan decision was not made by MFCU within 30 minutes of receiving the on-line Aimbridge application, the application was forwarded by Aimbridge to another lender.

The Indirect Lending Program began in July 2003, with MFCU amending its written loan policies on July 24, 2003 to include the Indirect Lending Program. MFCU CEO Poulos

2

testified that the policies and procedures for approving direct loans and indirect loans were the same. Using Clouthier's estimated 1/3 approval rate, 1448 indirect loans out of 4344 applications were approved during the four months between September 2003 and January 2004. On January 15, 2004, MFCU adopted a specific indirect loan procedure titled "Dealer Finance - Aimbridge." Loan approvals dropped off precipitously over the next four months to a total of 378: 356 in January 2004, 15 in February 2004, 4 in March 2004, and 3 in April 2004. At least 691 approved loans eventually lost a total of over $6.7 million. The parties do not dispute that the Bond coverage limit is $5.0 million.

> The Bond provides in pertinent part:
>
> We will pay you [MFCU] for your loss of "covered property" resulting directly from a named "employee's" "failure to faithfully perform his/her trust."
>
> \* \* \*
>
> "Failure to faithfully perform his/her trust" means acting in conscious disregard of your [MFCU's] established and enforced share, deposit, or lending policies.
>
> "Failure to faithfully perform his/her trust" does not mean:
>
> a. Negligence, mistakes, or oversights; or
> b. Acts or omissions resulting from inadequate training; or
> c. Unintentional violations of law or regulations; or
> d. Unintentional violation of your policies or procedures; or
> e. Acts or omissions known to, acquiesced in, or ratified by your Board of Directors; or
> f. Acts of an "employee" for which you could have made claim under Employee Or Director Dishonesty Coverage.

In moving for summary judgment, the parties dispute the meaning of this contract language, and whether a reasonable factual dispute remains whether MFCU's losses in the Indirect Lending Program resulted directly from Lewis', Clouthier's, and/or Batton's "failure to faithfully perform his/her trust."

## II. Standard of Review

3

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001). If the movant establishes by the use of materials specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986). Rather, there must be evidence on which a jury could reasonably find for the non-movant. McLean, 224 F.3d at 800.

### III. Analysis

#### A. Choice of Law

This court must apply Michigan's conflict of law rules. See Banek Inc. v. Yogurt

Ventures U.S.A., Inc., 6 F.3d 357, 361 (6th Cir. 1993). The parties agree Michigan law is controlling. See Wonderland Shopping Center Venture Ltd. Partnership v. CDC Mortgage Capital, Inc., 274 F.3d 1085, 1092 (6th Cir. 2001); Equitable Life Assurance Society of the United States v. Poe, 143 F.3d 1013, 1016 (6th Cir. 1998); Chrysler Corporation v. Skyline Indus. Serv., Inc., 448 Mich. 113, 120, 120 n.14, 125, 528 N.W.2d 698 (1995). The court will apply Michigan law.

### B. Contract Interpretation

CUMIS argues that the "conscious disregard" language of the Bond is analogous to the "deliberate indifference" standard found in civil rights cases alleged under 42 U.S.C. § 1983. MFCU counters that "conscious disregard" does not include a specific intent requirement, but only an objective element requiring proof that an employee knew of an MFCU policy and simply disregarded it. Stated differently, MFCU argues that the "conscious disregard" language does not require proof that an MFCU employee intentionally disregarded a known MFCU lending policy.

A court's obligation in interpreting a written contract is to discern the contracting parties' intent. Quality Products and Concepts Co. v. Nagel Precision, Inc., 469 Mich. 362, 375, 666 N.W.2d 251 (2003) (citing Sobczak v. Kotwicki, 347 Mich. 242, 249, 79 N.W.2d 471 (1956)). This intent is to be determined in light of the surrounding circumstances and from a reading of the instrument as a whole. Cleveland v. Detroit Trust Co., 264 Mich. 253, 257, 249 N.W.2d 842 (1933). If the contract language is clear and unambiguous, the contract is construed as a matter of law and enforced as written unless contrary to public policy. Quality Products, 469 Mich. at 375 (citing Farm Bureau Mut. Ins. Co. of Michigan v. Nikkel, 460 Mich. 558, 570, 596 N.W.2d 915 (1999)); Port Huron Ed. Ass'n v. Port Huron Area School Dist., 452 Mich. 309, 323, 550 N.W.2d 228 (1996) (citing Dykema v.

Muskegon Piston Ring Co., 348 Mich. 129, 138, 82 N.W.2d 467 (1957)). "Contractual language is construed according to its plain and ordinary meaning, and technical or constrained constructions are to be avoided." UAW-GM Human Resource Center v. KSL Recreation Corp., 228 Mich. App. 486, 491-492, 579 N.W.2d 422 (1998) (quoting Dillon v. DeNooyer Chevrolet Geo, 217 Mich. App. 163, 166, 550 N.W.2d 846 (1996)). Courts must give effect to every word, phrase, and clause in a contract to avoid an interpretation that would render any part of the contract surplusage or nugatory. Klapp v. United Ins. Group Agency, Inc., 468 Mich. 459, 468, 663 N.W.2d 447 (2003). Dictionary definitions may be used by the court to ascertain the plain and ordinary meaning of undefined terms. Coates v. Bastian Brothers, Inc., 276 Mich. App. 498, 504, 741 N.W.2d 539 (2007). A word is not considered ambiguous simply because dictionary definitions differ. Cole v. Auto-Owners Ins. Co., 272 Mich. App. 50, 54, 723 N.W.2d 922 (2006).

An employee's "failure to faithfully perform his/her trust" is expressly defined within the Bond to mean "acting in conscious disregard of [MFCU's] established and enforced . . . lending policies." The word "conscious" includes the dictionary definitions of "fully aware of or sensitive to something (often followed by *of*)," "aware of what one is doing," and "deliberate; intentional." Random House College Dictionary (1980 rev.ed.). An employee's "failure to faithfully perform his/her trust" is expressly defined in the Bond as not including an "[u]nintentional violation of [MFCU's] policies or procedures." Giving the terms "conscious disregard" their plain and ordinary meaning, and giving full effect to the term "conscious" in light of the definition "failure to faithfully perform his/her trust" read as a whole, the court construes the "conscious disregard" to mean intentional disregard of MFCU's established and enforced lending policies. Quality Products, 469 Mich. at 375; Klapp, 468 Mich. at 468; Detroit Trust Co., 264 Mich. at 257; Coates, 276 Mich. App. at

6

504; Cole, 272 Mich. App. at 54.

MFCU's argument that the contract language does not require an intentional disregard of MFCU's lending policies is not well taken in light of the plain and unambiguous wording of the Bond. Id. This court is obligated to give meaning to the term "conscious," and avoid a constrained construction of the terms "conscious disregard." Klapp, 468 Mich. at 468; UAW-GM Human Resource Center, 228 Mich. App. at 491-492. CUMIS's argument that the contract language invokes the "deliberate indifference" standard applicable in § 1983 cases is unpersuasive. CUMIS's argument that none of the MFCU employees may be found to have breached their obligation to "faithfully perform his/her trust" because none of the employees profited from the indirect loan failures is not supported by the contract language.

To prevail on their breach of contract claim, MFCU must prove inter alia that MFCU's alleged loss of over $5.0 million was the direct result of an MFCU employee's intentional disregard for an established and enforced MFCU lending policy. The court notes that, even if an MFCU employee intentionally disregarded an established and enforced MFCU lending policy, MFCU may not recover for breach of contract if these intentional "[a]cts or omissions [were] known to, acquiesced in, or ratified by [MFCU's] Board of Directors," or these intentional "[a]cts or omissions result[ed] from inadequate training."

### C. Cause of Losses

CUMIS argues that the direct cause of MFCU's losses in the Indirect Lending Program was MFCU's desire to quickly increase its loan portfolio by using Aimbridge and implementing "risk based lending," that is, making riskier loans to poorer "D" and "E" credit applicants at higher interest rates, and offsetting any defaulted high risk loans with the higher interest rate proceeds generated by these higher risk loans. CUMIS offers evidence

that CEO Poulis denied Lewis' requests to delay the July 2003 start of the Indirect Lending Program until staffing and training issues could be addressed, and denied Lewis' requests for two full-time underwriters and additional staff. CUMIS offers evidence that CEO Poulis frequently admonished Clouthier for denying indirect loan applications, directing her to "find a way" to approve the loans. CUMIS asserts MFCU's haste to enter "risk based lending" led MFCU to initially adopt the lending policies governing direct loans for the riskier indirect loans. CUMIS proffers evidence that MFCU adopted the "Dealer Finance - Aimbridge" indirect lending procedures on January 15, 2004 only after Doeren Mayew conducted an internal audit of the Indirect Lending Program and disclosed material deficiencies. CUMIS also cites a December 31, 2003 Report of Examination by Michigan's Office of Financial and Insurance Services to support its argument that it was the lack of established and enforced indirect lending policies that caused MFCU's losses. Clouthier testified at her deposition that she was not properly trained, and that she became overwhelmed by the number of computer-generated indirect loan applications she received given the 30 minute time-frame she had for approving or denying each application. Lewis, Clouthier, and Batton each denied ever intentionally disregarding an MFCU lending policy. CUMIS maintains that MFCU lacked any "established" or "enforced" indirect lending policies, and simply relied on the judgment of underwriters Clouthier and Batton. CUMIS argues that the July 24, 2003 "Lending Policy" is too vague to have been "enforced" by MFCU, with the Lending Policy recognizing "that lending is a judgment business" while citing "eight key factors" to consider and stating that "a member's intent and capacity to pay are the two most important factors that cannot be compromised."

MFCU argues that its policies and underwriting standards for the Indirect Lending Program were written by well-known expert Rex Johnson, an MFCU expert witness, and

were "established" as early as July 24, 2003. MFCU relies on the expert reports of Johnson, Alex Yarber of Doeren Mayew, and Robin Hoag of Doeren Mayew, which generally conclude that the subject indirect loans failed due to the underwriter's "conscious disregard" for MFCU lending policies, with the underwriters failing to verify an applicant's intent and capacity to pay, failing to consider excessive debt load and escalating debt, and permitting loan-to-value ratios to exceed MFCU limits. MFCU blames Lewis for "consciously disregarding" MFCU policies as incorporated into his job description as an MFCU Vice President by failing to implement an internal audit program for the Indirect Lending Program, and failing to monitor the indirect loans. MFCU asserts that its Chief Financial Officer (CFO) Hilary Clemens first discovered these policy violations in December 2003, resulting in the internal audit by Doeren Mayew. MFCU conveys that it first learned in December 2003 that MFCU employees had "summarily approved" over 1600 indirect loans, noting that Clouthier acknowledged at her deposition that she did not apply the "eight key factors" set forth in the Lending Policy. MFCU also proffers Clouthier's and Batton's employee evaluations for 2003 which are critical of their failures to adhere to MFCU policies, guidelines, and training. MFCU's expert Johnson opines that it should have taken Clouthier no more than five minutes on average to identify critical problems with any one particular indirect loan application. MFCU also proffers Clouthier's deposition testimony attesting that it was Lewis who told her to "buy deep" into "D" and "E" credit risks "to get this program rolling, we [are] going to have to get in favor with the dealers, because . . . the dealers [have] so many places where they could get financing for loans[.]" MFCU challenges the credibility of Lewis, Clouthier, and Batton, arguing CUMIS could withhold approval of their respective bonding in the future if their testimony is not favorable to CUMIS.

As indicated by the court at the April 24, 2008 hearing, after properly considering the proffered evidence on cross-motions for summary judgment, remaining questions of fact preclude granting summary judgment in favor of MFCU or CUMIS as to: whether MFCU's losses directly resulted from Lewis's, Clouthier's, or Batton's "conscious disregard" for an "established" and "enforced" MFCU lending policy; whether these employee's alleged acts of intentional disregard were known to, acquiesced in, or ratified by MFCU's Board of Directors; and whether such acts resulted from inadequate training. Amway Distributors, 323 F.3d at 390. A jury is not required to believe the testimony of any of the witnesses, or to adopt the opinions of the parties' expert witnesses. Construed in a light most favorable to MFCU, reasonable jurors could conclude on this record that, for example, MFCU's Clouthier intentionally disregarded the MFCU established and enforced lending procedures set forth in the July 24, 2003 Lending Policy to meet the overwhelming demand for indirect loans. Conversely, construed in a light most favorable to CUMIS, reasonable jurors could also conclude on this record that the July 24, 2003 Lending Policy as applied to indirect loans was not enforced by MFCU at CEO Poulos' direction, in an effort quickly expand MFCU's portfolio. The court makes clear that these are only examples of possible scenarios under which reasonable jurors could find for either MFCU or CUMIS; the court makes no dispositive determination whether Clouthier in fact intentionally disregarded MFCU lending policies, or whether any MFCU indirect lending policy was in fact unenforced. The complex factual issues presented by the record now before the court precludes summary judgment in favor of either party. First Nat'l Bank, 391 U.S. at 270; McLean, 224 F.3d at 800. Accordingly, MFCU's and CUMIS's cross-motions for summary judgment will be denied.

### D. Penalty Interest

>M.C.L. § 500.2006(1) of the MUTPA provides:
>
>(1) A person must pay on a timely basis to its insured, an individual or entity directly entitled to benefits under its insured's contract of insurance, or a third party tort claimant the benefits provided under the terms of its policy, or, in the alternative, the person must pay to its insured, an individual or entity directly entitled to benefits under its insured's contract of insurance, or a third party tort claimant 12% interest, as provided in subsection (4), on claims not paid on a timely basis. Failure to pay claims on a timely basis or to pay interest on claims as provided in subsection (4) is an unfair trade practice unless the claim is reasonably in dispute.

The parties dispute whether the statute provides for 12% penalty interest if an insurance claim is reasonably in dispute. Because it remains in reasonable dispute whether MFCU is "entitled to benefits under" the CUMIS Credit Union Bond, the court declines to issue an advisory opinion on summary judgment as to whether MFCU will be entitled to 12% penalty interest if MFCU prevails on its breach of contract claim.

## **IV. Conclusion**

Plaintiff Michigan First Credit Union's and defendant CUMIS Insurance Society, Inc.'s cross-motions for summary judgment are hereby DENIED.

SO ORDERED.

Dated: July 14, 2008

>s/George Caram Steeh
>GEORGE CARAM STEEH
>UNITED STATES DISTRICT JUDGE

>CERTIFICATE OF SERVICE
>
>Copies of this Order were served upon attorneys of record on July 14, 2008, by electronic and/or ordinary mail.
>
>s/Marcia Beauchemin
>Deputy Clerk